The next case today, number 221714, United States v. Edizon-Burgos-Montes. Will counsel for appellant please come up and introduce yourself on the record to begin? Good morning, may it please the court, AFPD Alejandra Bird Lopez on behalf of Edizon-Burgos-Montes. I'd like to ask for two minutes for rebuttal, if I may? You may. Thank you. In this case, the court below denied a compassionate release request by crediting the self-serving, conclusory, unsupported pronouncements of a BOP doctor and implicitly rejecting the well-reasoned and well-supported conclusions of an independent specialist and the information that was provided in the medical record. A review of the full record should lead this court to believe that that appraisal of the evidence was implausible and unreasonable and it should leave this court with a definite and firm conviction that a mistake was committed. Counsel, could you just move your microphone closer to your... Yes, absolutely. Thank you. This court should make that clear, that appreciation clear to the court below and remand for reconsideration in light of that conclusion. A matter of jurisdiction was raised prior to the briefing in this case. I think it's been adequately briefed. We're happy to supply further briefing if the court has any lingering doubts, but the government has conceded that point, and so I will focus my arguments on the merits. In this case, basically, the BOP doctor asserted that Mr. Borges was receiving adequate care based on the fact that he was now at a Care 3 facility that was better than the facility where he was prior, but he identified no significant changes in the treatment. And Dr. Bren had identified that the pharmacological regimen that was being used to control Mr. Borges' blood pressure was ineffective and without logical basis. And the BOP doctor's opinion did not explain or in any way reason out why the pharmacological regimen that he was receiving was appropriate. Counsel? When I read through the BOP doctor's letter, I think it was, he seemed to go through all of the interactions that your client had with the medical personnel in the prison, and it did seem like he sought medical care relatively frequently. And as you point out in your brief, his blood pressure readings were incredibly high for many of those care instances. But I guess my question to you is, is the fact that his blood pressure could not be adequately controlled, it's extremely concerning, but is it in and of itself an indication that he was receiving inadequate care? I mean, sometimes blood pressure is just very hard to control appropriately, and given the number of times that he received medical treatment and the medical personnel did make some changes in the dosages of some of the medications, why is that inadequate? Why was it clearly erroneous to conclude that it was adequate, in other words? Is there something else you would point to other than just the medication? Well, I think that with the information that's in the record, based on the information provided by Dr. Brenn and the information provided by Dr. Venuto, I think that the conclusion and the opinion of Dr. Brenn is that the treatment is ineffective. There's not sufficient effort to adjust and to try to find the right combination of medications that are in. But importantly, Mr. Burgos was referred for a sleep study and had a provisional diagnosis of sleep apneasins, which contributes a lot to hypertension. And that was pending for two years, and by the time this decision was rendered by the court below, it had been two years since that provisional diagnosis, and there had been no sleep study on the record of the medical record and no treatment for that condition. So that's part of it. But also the fact that there was no explanation of what was the logic behind the pharmacological treatment, and you can see that there really were really minimal changes made to the medications that were provided. So once he got transferred to the Level 3 facility, though, there appeared to be a period of time when they were reexamining the findings from the old facility and making efforts to adjust and schedule. So I'm not sure why we would say that that behavior was unreasonable. It seemed to be ongoing attention to his medical needs with an understanding that some adjustment needed to be made by virtue of the fact that he was transferred to a higher care facility. Well, the higher care facility had him under his care for 10 months while this motion was being litigated, or prior, the motion was litigated over the course of nine months, but he was there for 10 months before the court denied the compassionate release request. And basically it was him going to the medical area, getting his blood pressure taken, high blood pressure readings, not much change. So for purposes of the motion, don't we have to take the world as it was at the time of the filing of the motion? Well, I think that in the context of compassionate release, this court and other courts have been willing to sort of take the updated information as it becomes available, because that's what's relevant is the situation of the time. I'm just trying to figure out how that works exactly. Like at the time of the ruling on the motion is the basic idea? I mean, I think so. Information kept being provided. The government kept filing the medical record, which we were thankful for because we cannot get it as fast as the government can get it. And did the district court share your view of this? In other words, when the district court denied it, did the district court deny it based on the world as it was at the time the motion was filed or at the time with all those updated information? I think that it has to be taken as— No, what—oh, maybe you're about to answer me. Yeah, I think that the decision of the court, the way it's phrased, takes an understanding of the way things are at the time that the motion is being decided. The district court, again, I'm just looking at the text order, specifically looked at the BOP physician's assessment, right, which came many months after your client was at the facility. And I think that's his primary piece of evidence that he relies on. He says the court credits Dr. Gary Venuta's assessment that the defendant is receiving adequate medical, dental, and psychological care since arriving at FCC Coleman. And as such, the court isn't deciding the other prongs of the analysis. So it seems like the district court did consider the additional evidence. And also, Dr. Venuta's assessment really covers the time between he arrives at the CARE-3 facility and the present moment. Am I wrong in remembering the government doesn't address— I thought the government's—the thrust of the government's argument was along the lines of Judge Thompson's question, which was that he was only there a brief period of time before the motion was filed, and most of this is about what happened at the other facility. What does the government's—well, I can ask the government, I guess, what their position is, but I'm just trying to understand, what's the dispute in play with respect to this period of time in which there was extended treatment at the new facility that you think itself, on this record, has to be found inadequate? I think that—so at the time that the decision was rendered, Mr. Burgos' hypertension was still sky high, I mean really extreme. He had been hospitalized in a hypertensive crisis. There's no doubt that based on Dr. Brenn's assessment that was absolutely not contradicted, and I don't think it could be contradicted, is that this creates a very serious risk to Mr. Burgos of a heart attack or a stroke or organ failure or there are some other syndromes that are named in his opinion. So that's absolutely uncontested. And there is no movement from the kinds of treatment he was observing in the prior medical record and the kind of treatment he was receiving during. Dr. Brenn also makes a note at the time that he made his first assessment, which is that there are changes in the heart structure that are found in an echocardiogram which show that are the result of hypertension. And in the last letter that was filed by him, there is some indication that there is starting to be kidney failure. So the information that's being received is that this treatment, this lack of adequate treatment is already having an effect of causing permanent harm to Mr. Burgos. I see that my time is up, but I'm happy to answer any other questions that the court might have. Well, we would simply note that Mr. Burgos has served 19 years. He lives in fear every day. All his efforts at self-advocacy have been met with disdain and harassment. Can I just ask you? Yes. I'm not sure the government is disputing the objective facts about the seriousness of your client's condition in that extended period at the new facility. But they make the argument that in terms of how the treatment had changed, objectively the treatment had changed, and there's no indication other than, I mean, there's the outcome, which is the very serious health concerns that the client still has. But in terms of the treatment, what is the evidence that the treatment was inadequate during that period, independent of the fact of the health condition itself? So Dr. Bren's first letter shows or says, asserts that the fact that there is no change, that the readings of hypertension remain sky high is an indication already of inadequate treatment. And that in addition to that, and that in addition to that, he can see that the way the medications are being administered really doesn't allow for any improvement. There are two, there are literally two small increments in dosage over the course of nine months of his hypertensive medications, and that were not, and his blood pressure was not responsive to them. And that really is not enough. That does not show that there is adequate treatment. And it is not enough to controvert what Dr. Bren had said. And in fact, Dr. Bren now again reasserted, yes, I am still seeing the same problems. And these are all sub-optimal doses. Mr. Borgost? Just so I'm understanding, I thought the government's argument, I may have misread it, was that Dr. Bren talks about a problem with the dosage as to one particular type of medication, and then the critique the government offers is, but he's not accounting for the fact that there were alterations in other dosages. So the relevant question would be what's the interaction? What's your response to that? No, no. Did I misunderstand the government's argument? I believe that the government's argument was, and the government will have an opportunity to clarify, but I believe the government's argument was that since Dr. Bren, in saying that the pharmacological treatment was slow and ineffective was, and that gave an example of one of the medications. And the government's argument is, so he was only talking about one medication, but he's taking five other medications for this condition. You think that's just a misreading? If we read Dr. Bren's own thing, that's not a fair reading of what he was saying. It's not a fair reading because he was just giving an example. Okay. Thank you. Thank you, counsel. Will attorneys for Appoli please come up and introduce yourself on the record? Good morning. Assistant United States Attorney, Sean P. Murphy, on behalf of my client, the people of the United States of America. May it please the court. On August 25th, 2022, the district court did not abuse its discretion when it denied, without prejudice, Burgos' motion for compassionate release. Now, sister counsel addressed this briefly in saying that, you know, there was a jurisdictional question. It didn't seem that there were any questions for her. And, you know, to quote the great legal scholar, Conan O'Brien, I won't waste time if there are no further questions for the government about the jurisdictional question. I'll move right into the compelling and extraordinary circumstances. Now, this court has been clear that when it looks back at the district court, the district court has an institutional advantage over this court. So what happened a lot during sister counsel's time before your honors is that there was questions about and discussion about medications and quantities. And the fact of the matter is that over the nine months and eight days that this compassionate release motion was pending before the district court, there were 32 different defense filings. There were 22 court orders. There were 15 government filings and three separate motions in compliance by the United States probation officer. So the question isn't so much, like there's no need to get into the thousands of pages of medical records. What about her position that there is an unrefuted doctor's analysis of the inadequacy of the care? Is there any evidence in the record to refute it or to cast doubt on it? So to quote my esteemed colleague who wrote the brief, David Bornstein, the cure to that statement is by reading Dr. Venuto's letter. I mean, simply saying something doesn't make it so. And she says multiple times the government has no answer to this, no answer to this, no answer to this. But the record is an answer to that. And you can't just keep saying there is no answer when the answers are nose on the face playing before the court. Counsel, can I just ask you to focus in specifically on what Dr. Venuto said? Absolutely, you submitted a letter from him. And he does go through all of the care that was provided. But when I read the letter, it did strike me largely just as a list of what had transpired. It includes the dates of each time that his blood pressure readings were taken and then the adjustments and medication. But I didn't really see in the letter, and please tell me if I'm wrong, an overall assessment that this treatment is medically appropriate for XYZ reasons in my professional opinion. I just didn't see that there. So even though there was a response from the government, I wasn't clear on whether it addressed what, you know, defendants counsel had really raised to the court. Well, there were two letters from Dr. Venuto. The first, which gave a basic overview of what was happening with Mr. Burgos. And then the second, which was a direct response. And this is an important point, that the court ordered a direct response from the Bureau of Prisons to this concern and these health issues. And the Bureau of Prisons, both the doctor and the attorney advisor for the Bureau of Prisons, both filed separate responses. And in that, I mean, that letter itself goes on for six pages, seven pages. Is there something specific in the letter that you would point us to as you think, you know, most critical to your arguments and the reason why you think there was a sufficient response? So the letter itself goes through all of the, as Your Honor mentioned, all of the different characteristics. At the end of it, it says his request for compassionate release was denied on May 23rd, 2022. So this is important, that as this court is well aware, the kind of sole gate through which one must pass in order to file a prisoner-initiated motion for compassionate release under the First Step Act is they have to exhaust their administrative remedies. It was done in this case by filing a letter, allowing for the 30 days to lapse, and then initiating the motion before the district court. The response to that motion for reduction in service from the Bureau of Prisons did come. It's part of the record. It's Supplemental Appendix 528, and it denies. But, Counselor, Judge Brooklyn is asking you a different question. We're trying to figure out where in there someone from the government opines about the efficacy of the treatment that he's receiving. His argument is that, yeah, you all are doing stuff to me, but you're slowly killing me because you're not treating me correctly. And she's saying the proof is in the pudding because I wound up in the hospital with this high blood pressure crisis. Plus, I have a doctor saying it's not adequate. So is there anybody on the other side saying it's adequate? Not denying it, not denying the claim, but saying there is adequate care. Well, there's the – so to ask a doctor to weigh in on the ultimate legal question. They do that all the time now. They give medical opinions all the time. That's what doctors do. They formulate an opinion, and then they provide treatment. That's what doctors do. But it's important to note that this doctor, Dr. Bren, never saw Burgos, never interacted with him. Well, there's two possibilities. One possibility is that Dr. Bren testimony is so weak it's self-undermining, or it can't carry the case, or there's perfectly free to disregard it. I thought the colloquy we were having was not on that premise, but the premise that there was a refutation of it, and then the district court could choose between the two, and then it's clear error, et cetera, whatever the test is. But what Judge Rickleman was asking, is there something on the other side that refutes it? And we're trying to get an answer to that question first. It may be of a separate argument, which is even if we didn't have an answer, all there was was Dr. Bren. It wouldn't be enough because Dr. Bren's evidence is so weak. But let's get to that in a second. I thought you were suggesting Dr. Venuto provided a reputation of Dr. Bren's position. So Dr. Venuto specifically says or mentions that his request for compassionate release was denied on May 23rd, 2022. If you go to that letter, it says, based on the information you have provided, you have not demonstrated extraordinary or compelling circumstances which would warrant a reduction in sentence under BOP guidelines. And then the attorney letter from the attorney advisor, Kenneth Lee Richardson, Esquire, on Supplemental Appendix 518, gives the overview of the decision. So in essence, we don't have just one refutation. But you have none of those people. Those people are doing exactly what you said you wouldn't want us to have done, which is they're taking a position on the ultimate legal question. What we would like to know is what was their medical opinion about how good the treatment was. None of them seem to be stating it. They come to the legal conclusion, deny, deny, deny. But what was their medical predicate for that decision? Did they ever articulate it? It sounds like they didn't quite. They did. And in Supplemental Appendix 519, it specifically says, he continues to receive evidence-based proven effective medical care with access to enhanced medical within the community as medically necessary here at FCC Coleman. Who is that from? That's from the attorney advisor from BOP, after having reviewed the records, the entirety of the records. That's from the attorney advisor? Yes, Your Honor. That's his judgment about what the – but is there any evidence from a doctor saying as much? I mean, it says right in this – in Supplemental Appendix 467, his records contradict his allegations. That's from Dr. Gary Venuto. I mean, I'm sorry to be flustered on this question, but I read through this entire record and everything in it, the medical – and I'm losing the thread here. The thread is that it's not before this court-to-armchair expert what happened in the court below. That court has an institutional advantage over this court. It had every document that this court now has in the record before it. It had the letters. It had the time. It had over nine months to analyze and weigh these weighty questions. And, in fact, the judge – I mean, his text orders at the beginning were – showed that he did not agree that Burgos was receiving adequate care. He doesn't say alleged mismanagement. He just says BOP shall respond to the mismanagement. And, in fact, the probation officer, their first motion in compliance was no, he doesn't qualify for compassionate release. Second motion in compliance, yeah, he does qualify for compassionate release. Third, after they reviewed the entirety of the record, no, he does not qualify for compassionate release. Now, this kind of back and forth should show this court that this – that the district court wasn't sitting on its haunches. It wasn't just reading through the record and – or giving a – I see my time has expired. May I finish the thought? Yeah. The – this court – the district court was not sitting back, taking this lightly. It weighed the evidence. It made requests over the course of 15 different orders. When it had any doubt, it asked for more information. And what in the record shows it? It's all there. But the more important question is did the district court see something? And it asked for it. It changed its opinion. Probation changed its opinion. And – Counsel, if I can just ask you one last question. I completely agree with you that the district court was very active in managing the case here. And as you said, asked for additional briefing, was concerned that your initial responses didn't cover – didn't address what he was evaluating. But putting aside whether what Dr. Venuto submitted in response was clear enough, there is the issue of the – because we do have to review the district court's decision for clear error in some respects. There is the issue of the sleep apnea and whether he was not receiving – I think it's called a CPAP machine. I'm not sure how you say it. But he wasn't receiving that despite actually the fact that the prison medical personnel were saying that he really didn't need it. And it really – sleep apnea apparently really contributes to hypertension. So just what about that? Why, as your opposing counsel has said, why isn't the delay in getting him that treatment, which they view as critical, inadequate care? So – and I'll answer this by addressing it under the compelling and extraordinary circumstances prong of the analysis because, as the court below mentioned, the 3553-AI analysis did not play a part in this ultimate decision. There are really two parts of the compelling and extraordinary. There's either the characteristics of the defendant themselves or, as this court recognized in Sokocha, it's not unreasonable for this court to take into account gross mismanagement of an inmate by the Bureau of Prisons. In this court's decision in Sokocha, it cites to a case from the District of Rhode Island, Crowell, in which that inmate had lupus, said they had lupus, was diagnosed with syphilis, was mistreated for syphilis for over a year, disobeyed a court order to have that defendant seen by a rheumatologist. Again, disobeyed a court order. In that decision, that court cited to the Middle District of North Carolina a decision where an inmate was granted compassionate release. She was diagnosed with breast cancer. There was a lot of delay. That was metastatic breast cancer. By the time they eventually got her to the point where she could be treated, radiology was no longer an option because it was too late. A tragic case, but that case also had a concurrent civil case that had been filed. So, all this to say, is the compelling and extraordinary circumstances his health conditions? No, no. It's hypertension and probable sleep apnea. Seventy-five percent of the people in this room may have one or both of those conditions right now. So, the question has to be whether or not BOP's management of it was compelling and extraordinary. And the entire record as it developed shows that it was. There weren't these long delays in having him seen. Yes, there appeared to have been some delays in getting the sleep analysis done, but the record also is constrained to the time period. The government asked for evidentiary hearings, which counsel was proud to say in her brief that she vociferously denied the request for the government to present evidence to the district court. So, is there an avenue for this defendant to seek a redress of his alleged wrong that he can't get a sleep study done in an adequate amount of time? Absolutely there is, but the First Step Act, an emotion for compassionate release, is not that avenue. The First Circuit's, this court's case law is clear on that point, and based on the entirety of the record and the very careful consideration and determination by the district court, we respectfully ask this court to affirm. Thank you. Thank you, Counsel Attorney Bert Lopez. Please reintroduce yourself on the record. You have a two-minute rebuttal.  AFPD, can you hear me okay? Is that okay? Yes.  AFPD Alejandra Bert Lopez. Mr. Venuto's letter is cast as a response to Dr. Bren's letter, but it's really a mere summary of the medical record. The brief in this case, the brief on this appeal shows that Mr. Venuto's letter was deficient, because in the brief, Counsel for the Government tries to tie up all the loose end that Venuto left unexplained, of why he didn't justify the treatment that Mr. Burgos was receiving during the time that the motion was pending. Counsel for the Government mentioned that Dr. Bren never met with or examined Dr. Burgos. Neither did Dr. Venuto. His letter is based on a review of the medical record. It's not clear. I am reasonably sure that it doesn't seem that he even talked to the treating physicians. He could have done any of these things, and he didn't. I want to refer the Court's attention to our response to the letter in the record below, because it details all of the points and talks about all of the different points that are included in that letter, and it's in Supplemental Appendix 734 to 752. In this case, the government had every opportunity to contest and to explain why Mr. Burgos' situation, which is obvious from his medical record, that he had not improved with the move to Coleman. They had every opportunity to explain why they were still offering adequate treatment, and they did not. They did not on the terms of a medical opinion. Before you close, could you just address the question Judge Rickleman was asking about the sleep apnea test? Yes. You've heard the government's response to that. I mean, I don't have an explanation for their two-year delay in actually getting the sleep test, and there is even a note at some point in the medical, and it's referred to- At the time the motion is decided, he does or doesn't have the- He does not at the time the motion is decided. There might even be a note there. I'm not saying might. There is a note at some point in the medical record, and I can- I think the reference, it's referred to in our brief, but that he should get a sleep apnea machine even if they haven't done the sleep study ASAP because of the incredibly extraordinary high hypertension that he has every single time he gets a reading. And the government completely controls the quality of the information that's included in the medical record, the times he gets to the medical area, the times he is able to get somebody's attention to get him taken to the medical area. The government controls that completely. It's incredible that even with the great control that the prison has over the medical record and over the attention that it gives the case that we have the information that we have. Thank you. Thank you. That concludes argument in this case.